# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 14-cv-80514-MIDDLEBROOKS/BRANNON

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DELROY ANTHONY GOLDING,
a.k.a. Michael Genas,

      Defendant,

v.

DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

      Third Party Defendants.

_____/

## OPINION AND ORDER

This is an action for denaturalization brought by Plaintiff, the United States of America ("Government"), against Defendant Delroy Anthony Golding ("Golding") under 8 U.S.C. § 1451(a). The Government seeks an order revoking Golding's United States citizenship. On January 22, 2016, I held a bench trial at which time documentary and testimonial evidence were presented. An attorney from the Office of Immigration Litigation of the United States Department of Justice in Washington, D.C. appeared on behalf of the Government. Golding appeared *pro se*. Based on the testimonial and documentary evidence presented, the Court makes the following findings of fact and conclusions of law.[1]

---

[1] To the extent that any findings of fact constitute conclusions of law, they are hereby adopted as such; to the extent that any conclusions of law constitute findings of fact, they are also so adopted.

## I.      Findings of Fact

1. Delroy Anthony Golding is a native of Jamaica.  In 2011, Golding became a naturalized citizen of the United States.  (Gov. Ex. 2; Gov. Ex. 1).

2. Golding entered the United States on October 21, 1989 as a temporary agricultural worker.  He entered as part of the Jamaican Central Labor Organization's Program ("JCLO Program" or "Program") with the United States Government whereby Jamaican laborers would contract to temporarily work with United States corporations.

3. At trial, the Government presented testimony from Lascelles Reece, a former employee of JCLO who worked for the Program in Miami.  Reece testified that JCLO's representatives in Jamaica would travel to towns and identify prospective Jamaican men to participate in the Program.  Men identified by JCLO would then travel to Kingston where they would be examined.  When asked at trial what the requirements were for men participating in the program, Reece testified the only requirement was that the men be physically fit.  When asked whether the program allowed people with criminal records to participate, Reece answered "not if we know of it."  Reece testified that men in the Program were issued an identification card ("ID card") by the Jamaican government. Men were also given a U.S. Form I-94, which was also completed by the Jamaican government.  Reece testified that the Program did not require participating men to have a passport or visa.  Reece testified that once the men had been issued their paperwork, the men were flown on charter flights to the United States. Approximately 15,000 workers would enter the United States per year as part of the Program.[2]  (Reece Testimony).

---

[2] This number may be low.  By one account, Caribbean-based guest worker programs in the 1980s were "importing some 100,000 farmworkers a year."  *See* Cindy Hahamovitch, *No Man's Land* (Princeton University Press, 2011), 5.

4. In 1989, JCLO identified Golding as a prospective worker for the Program. Golding subsequently travelled to Kingston for evaluation. The Jamaican government gave Golding his ID card and his completed Form I-94. (Golding Testimony).

5. Both the ID card and Form I-94 that Golding used for entry into the United States were issued to "Michael Genas." At trial, Golding testified that he did not know the reason the card was issued to "Michael Genas." Golding testified that he believed it was issued under the name "Michael Genas" because that was an alias used by his late brother, whom Golding resembled. He testified that acquaintances in Jamaica sometimes called him Michael Genas because of his brother. He testified that the people at the Kingston office who prepared the ID card and Form I-94 must have known of his nickname. The Government produced no evidence at trial that Golding ever provided documents with the name "Michael Genas" to the Jamaican government, or otherwise told the Jamaican government that his name was "Michael Genas."

6. A visa was not required for workers who entered the United States through the JCLO Program at this time; accordingly, Golding never applied for, nor received, a visa. (Reece Testimony; Hugh Spafford Testimony).

7. Golding was admitted to the United States on October 21, 1989 under the name "Michael Genas." (Golding Testimony; Gov. Ex. 10, Application for Permanent Residence).

8. After admission to the United States, Golding worked for Osceola Farms, Co., through the JCLO Program. (Gov. Ex. 12).

9. On April 4, 1990, Golding married Nancy May Golding, a United States citizen, who subsequently filed a Form I-130 Petition for Alien Relative on Golding's behalf. (Gov. Ex. 9, Form I-130, Petition for Alien Relative). On this form, Nancy Golding disclosed

3

that her husband had previously used the name "Michael Genas." (Gov. Ex. 9, Form I-130).

10. Golding concurrently submitted his I-485 Application for Permanent Residence to the Immigration & Naturalization Service ("INS").[3] (Gov. Ex. 10, Form I-485, Application for Permanent Residence) ("1991 Application"). Like his wife, Golding disclosed on his 1991 Application that he had previously used the name "Michael Genas" on his Form I-94. (Gov. Ex. 10).

11. Golding did not disclose on his 1991 Application that he had a conviction in Jamaica for unlawful wounding when he was sixteen years old. (Gov. Ex. 10; Gov. Ex. 19, DE 93-1).[4] Golding testified that he was represented by counsel who advised him that, because the conviction was a juvenile conviction, he did not need to disclose it to INS.

12. As part of his process to become a permanent resident, Golding interviewed with Jorge Roig ("Roig"), an examiner for INS at the Miami field office. (Roig Testimony). The Government presented testimony from Jorge Roig at trial. Roig testified that he reviewed the 1991 Application with Golding. Roig testified Golding did not tell Roig about his conviction in Jamaica, because, if he had, Roig would have been required to do a follow-

---

[3] In 2003, the United States Citizenship and Immigration Services ("USCIS"), United States Immigration and Customs Enforcement ("ICE"), and United States Customs and Border Protection ("CBP"), superseded INS. This Court refers to INS for actions taken regarding Golding's applications before 2003, and to USCIS for actions taken after 2003.

[4] The records from the Jamaican government regarding Golding's 1984 conviction are not part of the record in this case. Instead, the Court has conflicting statements from the Jamaican Constabulary about what happened to those records. A 2015 letter from the Clerk of Courts in St. Catherine, Jamaica, submitted by Golding, states that records relating to Golding's conviction were destroyed by a fire in 2004. (Def. Ex. 1, DE 84-1). However, a 2007 memorandum from the Superintendent of Police in Kingston, Jamaica, submitted by the Government, states that the records are unavailable because "Access to juvenile records in Jamaica is restricted." The memorandum also states that a search of the records shows Golding was convicted for unlawful wounding and was sentenced to 18 months' probation in 1984. (Gov. Ex. 20, DE 93-2).

4

up inquiry into the conviction.  Roig gave no indication of how his decision would have been different if the conviction had been disclosed.  When I asked Roig whether it would have mattered that Golding was convicted as a juvenile over five years before entry to the United States, he answered it "would most likely be the case" that it would not have made him inadmissible.

13. On February 13, 1991, INS granted Golding's 1991 Application and Golding became a permanent resident.  (Gov. Ex. 10).

14. A little over ten years later, on March 21, 2001, Golding filed his Form N-400 Application for Naturalization with INS.  (Gov. Ex. 6, Form N-400, Application for Naturalization) ("2001 Application").  On the 2001 Application, Golding checked the box that he had previously been "arrested, cited, charged, indicted, convicted, fined or imprisoned . . ." (Gov. Ex. 6).  On September 15, 2003, the U.S. Citizenship and Immigration Services ("USCIS"), the successor agency to INS, denied Golding's application for naturalization.  (Gov. Ex. 7).

15. On October 17, 2003, Golding filed a Request for Hearing on the decision to deny his 2001 Application.  (Gov. Ex. 8).  In 2004, Golding interviewed with Michael Krawczyk, an adjudications officer with USCIS.  Krawczyk asked Golding questions about five arrests that Golding had disclosed.[5]  (Krawczyk Testimony; Gov. Ex. 6; Gov. Ex. 24).  Golding did not tell Krawczyk about his juvenile Jamaican conviction.  (Krawczyk Testimony).  USCIS affirmed its denial of Golding's application on December 22, 2004.  (Gov. Ex. 8).

---

[5] Notably, Golding was never convicted of these crimes.  All were either *nolle prossed* or Golding was found not guilty.  Golding's only conviction is the juvenile conviction from Jamaica.

16. On April 21, 2005, Golding filed an application in the Southern District of Florida for *de novo* review of the denial of his 2001 Application, pursuant to 8 U.S.C. § 1421(c). *Golding v. Dep't of Homeland Sec.*, No. 05-21095-CIV, 2009 WL 2222779, at *1 (S.D. Fla. July 27, 2009). ("2008 Trial"). At a bench trial, beginning on June 29, 2008, Magistrate Judge Edwin Torres, sitting by consent jurisdiction, evaluated the requirements for naturalization. Magistrate Judge Torres found that Golding had not proven by a preponderance of the evidence that he satisfied all of the requirements for citizenship. Specifically, Magistrate Judge Torres found that Golding had not shown good moral character for the five years preceding his application for naturalization. The District Court denied Golding's application for naturalization in a decision dated July 27, 2009. *Id.* at *15

17. On September 18, 2009, Golding filed another Form I-485 Application to Register Permanent Residence or Adjust Status. (Gov. Ex. 4) ("2009 Application"). On the 2009 Application, Golding disclosed that he had previously used the name "Michael Genas." (Gov. Ex. 4, G-325A, Biographic Information). Golding also disclosed that he had "been arrested, cited, charged, indicted, fined or imprisoned for breaking or violating any law or ordinance . . ." (Gov. Ex. 4). Golding attached to this application an Addendum explaining his arrests, including his juvenile conviction in Jamaica. (Gov. Ex. 4). Additionally, Golding checked the box that he had "by fraud or willful misrepresentation of a material fact, [] sought to procure, or procured, a visa, other documentation, entry into the United States, or any immigration benefit." (Gov. Ex. 4).

18. Also on September 18, 2009, Golding filed a Form I-601 Waiver of Inadmissibility. (Gov. Ex. 5) ("I-601 Waiver"). Golding stated his reason for inadmissibility was "INA

Section 212(a)(6)(c)(i)," which provides that an alien is inadmissible if he "by fraud or willfully misrepresenting a material fact, seeks to procure . . . a visa, other documentation or admission into the United States." (Gov. Ex. 5).

19. At trial, the Government presented testimony from Connie Kaczor, an adjudications officer for USCIS. Kaczor testified that she adjudicated Golding's 2009 Application. She testified that Golding had told her he had been arrested five times, and that she knew this because she had written "5 times" on the 2009 Application. Kaczor also testified that Golding had told her he had made a false representation to procure a visa.[6] Kaczor testified that the I-601 Waiver was filed but never adjudicated. She speculated the reason it was not adjudicated was because Golding was already admitted as a permanent resident. (Connie Kaczor Testimony; Gov. Ex. 5). On August 18, 2010, Connie Kaczor, for USCIS, denied Golding's Application to Adjust Status because he was already a legal permanent resident. (Gov. Ex. 14; Kaczor Testimony).

20. On November 17, 2010, Golding filed a second Form N-400, Application for Naturalization. (Gov. Ex. 2, N-400, Application for Naturalization) ("2010 Application"). On the 2010 Application, Golding disclosed that he had previously used the name "Michael Genas." (Gov. Ex. 2). Golding also disclosed that he was arrested for unlawful wounding in Jamaica at age sixteen. (Gov. Ex. 2). Golding further checked the box to disclose that he had previously "given false or misleading information" for the purpose of obtaining an immigration benefit. (Gov. Ex. 2).

---

[6] As discussed above, Golding was not required to have a visa, and did not have a visa, when he entered the United States.

21. On April 28, 2011, Solea Wright, an immigration services officer with USCIS, reviewed the 2010 Application with Golding.  (Wright Testimony).  After review of the 2010 Application, Wright approved Golding's naturalization. (Gov. Ex. 2; Wright Testimony).

22. At trial, the Government presented testimony from Solea Wright.  The Government asked her if she made a mistake in approving the application.  Wright said yes.  When the Government asked Wright why she made a mistake, Wright asked to see Golding's file. After review of the file, Wright testified she believed the reason she had made a mistake was because Golding had held himself out to be a citizen prior to being naturalized.  The Government presented no evidence to support this contention.  Wright testified that she was aware of Golding's arrests, including his Jamaican conviction at the time she approved the application.  (Wright's Testimony).  Wright did *not* testify that she made a mistake because Golding was ineligible based on his criminal history or because he had previously misrepresented a fact to immigration officials.

23. On May 23, 2011, twenty years after he became a permanent resident, Golding took the oath of allegiance and was naturalized as a United States citizen. (Gov. Ex. 1).

24. A little under three years later, on April 15, 2014, the Government filed the Complaint in this Court seeking to denaturalize Golding under 8 U.S.C. § 1451(a).  (DE 1).

25. The Complaint alleges four counts: Count I, illegal procurement of naturalization by unlawfully obtaining admission to the United States for permanent residence; Count II, illegal procurement of naturalization by giving false testimony that adversely reflected on Golding's moral character at the 2008 Trial; Count III, illegal procurement of naturalization by giving false testimony that adversely reflected on Golding's moral character at a 2007 deposition made in preparation for the 2008 Trial; and Count IV,

illegal procurement of naturalization through willful misrepresentation and concealment of a material fact. The Government orally dismissed Count IV on the morning of the bench trial, and memorialized this dismissal in its Closing Statement. (DE 98-1).

## II.   Conclusions of Law

"[T]he right to acquire American citizenship is a precious one and . . . once citizenship has been acquired, its loss can have severe and unsettling consequences." *Fedorenko v. United States*, 449 U.S. 490, 505 (1981). As a result, the Government "carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship." *Costello v. United States*, 365 U.S. 265, 269 (1961). The Government must put forth evidence justifying revocation that is "clear, unequivocal, and convincing and not leave the issue in doubt." *Fedorenko*, 449 U.S. at 505 (internal quotations and citations omitted); *see also Kungys v. United States*, 485 U.S. 759, 776 (1988) (requiring for the purposes of § 1451 that materiality be shown by "clear, unequivocal, and convincing evidence."). A less exacting standard "would be inconsistent with the important right that is at stake in a denaturalization proceeding." *Fedorenko*, 449 U.S. at 505-506.

The Immigration and Nationality Act provides for denaturalization of citizens whose citizenship orders and certificates of naturalization were either (1) "illegally procured" or (2) "procured by concealment of a material fact or by willful misrepresentation."[7] 8 U.S.C. § 1451. Naturalization is illegally procured if the applicant fails to strictly comply with all statutory

---

[7] A certificate of citizenship is "procured by concealment of a material fact or by willful misrepresentation" if the applicant willfully misrepresents or conceals a material fact and the "citizenship [is] obtained as a result of the *application process in which the misrepresentations or concealments were made*." *Kungys v. United States*, 485 U.S. 759, 776 (1988) (emphasis added). The evidence presented at the bench trial focused on the illegal procurement clause, because the Government voluntarily dismissed the only count where the "concealment and misrepresentation" clause would apply.

prerequisites for naturalization. *See Fedorenko*, 449 U.S. at 524. One of these statutory prerequisites is that an applicant has been "lawfully admitted for permanent residence." 8 U.S.C. § 1427(a). Another statutory prerequisite is that "during [the five years immediately preceding the date of filing his naturalization application the applicant] has been and still is a person of good moral character." 8 U.S.C. § 1427(a).

In Count I, the Government argues that Golding should be denaturalized because he illegally procured naturalization through unlawful admission for permanent residence. In Counts II and III, the Government argues that he should be denaturalized because he illegally procured naturalization as he did not have the requisite good moral character for the statutory period.

### a.   Count I: Illegal procurement for failure to lawfully obtain admission as a permanent resident

The Government argues Golding was not "lawfully admitted for permanent residence" under 8 U.S.C. § 1427(a). In order for an alien to be lawfully admitted for permanent residence, the alien must be "eligible to receive an immigrant visa and [be] admissible to the United States for permanent residence." 8 U.S.C. § 1255(a). The criteria which make an alien "ineligible to receive visas and ineligible to be admitted to the United States" are outlined in 8 U.S.C. §1182. Specifically, under 8 U.S.C. § 1182(a)(6)(C)(i), "[a]ny alien who, by fraud or *willfully* misrepresenting a *material* fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this statute is inadmissible." (emphasis added).

The Government appears to allege two different theories of why Golding was not lawfully admitted for permanent residence. The first theory, advanced in the Complaint, is that Golding misrepresented his name and criminal history in order to gain "admission into the

United States," in violation of 8 U.S.C. § 1182(a)(6)(C)(i). The second theory, advanced in summary judgment briefing and at trial, is that Golding misrepresented his name and criminal history at the time he applied for an adjustment of status to permanent residency in 1991, in order to procure "a benefit provided under" the immigration statute, in violation of 8 U.S.C. § 1182(a)(6)(C)(i).

### i. Golding's Entry to the United States

The Government contends that Golding entered the United States in 1989 under the assumed name "Michael Genas" and failed to reveal his conviction in Jamaica in 1984 for unlawful wounding.    (Complaint at ¶ 48).    The Government contends these were misrepresentations of a material fact made by Golding in order to gain admission into the United States, in violation of 8 U.S.C. § 1182(a)(6)(C)(i). To prevail on this Count, the Government needs to show by clear, unequivocal, and convincing evidence that Golding willfully misrepresented his name and criminal history in order to gain admission into the United States. The Government has failed to do so.

For starters, Golding never applied for, nor was required to apply for, a visa for admittance into the United States. Two of the Government's witnesses, Lacelles Reece and Hugh Spafford, both testified that a visa was not required.  Instead, the process by which Golding came into the United States as a laborer was administered by the Jamaican government. Golding testified that the Jamaican government gave him his ID card and Form I-94.  Reece testified that the Jamaican government filled out the ID card and Form I-94 for the men, based on answers given by the men. This was further supported by testimony of Hugh Spafford, a Miami-based INS inspector.  Spafford testified that the Form I-94s for men in the Program were typewritten, when usually the general public's I-94 were handwritten on the airplane.  The

Government presented no evidence that Golding willfully misrepresented his name and criminal history to obtain his ID card or Form I-94 from the Jamaican government. The Government presented no evidence that Golding provided the Jamaican government with any information regarding his name or criminal history. They further presented no evidence that he was asked to provide his name or criminal history. The Government presented no documentation whatsoever produced by Golding to the Jamaican or United States governments to obtain admission into the country.

In support of its theory that Golding "willfully misrepresented" his name, and by extension his criminal history, the Government attempted to show that Golding knew when he got on the airplane to come to the United States that his ID card and Form I-94 were issued to "Michael Genas." At trial, there was inconsistent testimony presented by the Government regarding whether Golding would have seen or received the I-94 or ID card from the Jamaican government prior to entering the United States. Golding testified that the I-94 and ID cards were carried by a team leader on the trip to the United States. He testified that he did not see the I-94 or ID card until he reached the United States. Reece testified that the men carried their own documents, and he was adamant that the team leader did not carry the mens' I-94 or ID card. However, another Government witness, Hugh Spafford, testified that the I-94s were carried by a team leader, but that he believed the ID cards were carried by the individual laborer. The Government has not presented clear, unequivocal, and convincing evidence that Golding would have carried or seen his own ID card or I-94. By extension, they have not shown Golding willfully misrepresented his identity to gain admission to the United States. But even assuming the Government has shown that Golding knew the ID card and I-94 were issued to "Michael

Genas," the Government would still need to show that Golding's misrepresentation of his name was material. For reasons stated below, the Government has failed to prove materiality.

Under § 1182(a)(6)(C)(i), the Government must show that Golding misrepresented a "material fact" in order to procure admission to the United States. In *Fedorenko*, the Supreme Court explained that—in evaluating a false statement under § 1182—materiality "must be measured in the terms of [the false statement's] effect on the applicant's admissibility into this country." *Fedorenko*, 449 U.S. at 749.

There are two allegedly "false statements" or omissions from Golding's paperwork that must be evaluated for materiality. The first false statement is that Golding entered under the name "Michael Genas." A misrepresentation pertaining to identity is not *per se* material. *Matter of NG*, 17 I. & N. Dec. 536, 537 (B.I.A. 1980). That Golding entered under an assumed name would only affect the inquiry in this case because it may have led to information regarding Golding's Jamaican conviction. For reasons discussed below, however, that information would have been unlikely to affect Golding's admissibility. Accordingly, the Government has not shown that Golding's use of the name "Michael Genas" was a material false statement.

The second omission is that Golding did not disclose his Jamaican conviction for unlawful wounding. While criminal convictions may affect an applicant's admissibility, *see* 8 U.S.C. § 1182(a)(2), Golding's conviction occurred when he was sixteen years old and he was only sentenced to probation. An exception to the inadmissibility provision for criminal conduct is provided if the alien "was under 18 years of age and the crime was committed . . . more than 5 years before the date of application for a visa or other documentation and the date of application for admission to the United States." 8 U.S.C. § 1182(a)(2)(A)(ii)(I). According to the limited records from the Jamaican Court system, Golding was convicted on September 10, 1984. Then,

on October 21, 1989, a little over five years later, Golding entered the United States. As discussed above, there is no evidence that Golding submitted any documentation or application to obtain his ID card or enter the United States under the Program. Accordingly, based on the only dates in evidence—the date of the conviction and the date he entered the United States—it is unlikely that his conviction would have affected his admissibility because of the exception provided in § 1182(a)(2)(A)(ii)(I).

Accordingly, the Government has failed to show by clear, unequivocal, and convincing evidence that Golding was inadmissible under § 1182 for failure to disclose his real name and Jamaican conviction when he entered the United States.

### ii. Golding's 1991 Application for Permanent Residency

The Government's second theory is that Golding's failure to disclose his juvenile Jamaican conviction on his 1991 Application amounts to "willfully misrepresenting a material fact" to procure an immigration benefit, specifically, permanent residency, in violation of 8 U.S.C. § 1182(a)(6)(C).

Guidance on the meaning of a "materiality" in the context of misrepresentations for applications for permanent residency is found in the Supreme Court's decision in *Kungys v. United States*, 485 U.S. 759 (1988). In *Kungys*, Justice Scalia explains that the most common formulation of a material concealment or misrepresentation is something that "has a natural tendency to influence, or was capable of influencing, the *decision* of the decisionmaking body to which it was addressed." *Id.* at 770 (emphasis added) (internal quotations omitted). Justice Scalia goes on to examine the common use of the term "material" throughout federal statutes, explaining that "[w]here Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress

means to incorporate the established meaning of these terms." *Id.* at 770.   Ultimately, the Supreme Court holds that the test of whether "concealments or misrepresentations were material is whether they had a natural tendency to influence the decisions of the Immigration and Naturalization Service." *Id.* at 772.

Although, the *Kungys*' Court addresses materiality under § 1451 and not § 1182(a)(6)(C),[8] the Government contends, and the Court agrees, that the same standard should apply to both statutes.   *See* DE 35 at 15, Motion for Summary Judgment ("A misrepresentation is material to naturalization if the misrepresentation 'has a natural tendency to produce the conclusion that the applicant [is] qualified' to naturalize."); DE 98-1 at 2, Closing Statement ("the test . . . is whether they had a natural tendency to influence the decisions" of the INS). Considering that in both § 1451 and § 1182 the issue is whether an applicant has misrepresented a material fact in an application for an immigration benefit, there does not seem to be any reason why materiality under § 1182 would be a different standard than § 1451.

The Government argued at trial that it is the "failure of the ability to investigate" that made Golding's omission material—but that is not the standard.   The Government continued to argue this in its Closing Statement, stating: "As the adjustment of status adjudicator, George Roig, testified in Court, he would have been unable to approve Golding's application for adjustment of status had he revealed the crime but instead *would have engaged in further inquiry* as to whether Golding's Jamaican crime made his ineligible for naturalization." (DE 98-1 at 2).

---

[8] As discussed above, the "concealment or misrepresentation" clause of § 1451 applies only where the "order and certificate of naturalization" were procured by a concealment of a material fact or willful misrepresentation.   The procurement of other benefits, including admission for permanent residence, is not covered.   Accordingly, Count I relates to the "illegal procurement" clause of § 1451—not the "concealment or misrepresentation" clause.   However, the theory that Golding illegally procured his naturalization under the "illegal procurement" clause hinges on the language in § 1182(a)(6)(C), which states an individual is ineligible for admission if he seeks an immigration benefit "by fraud or willfully misrepresenting a material fact."

Notably, the Government does not argue that Roig's decision would have been different—only that he would have taken different actions. As discussed above, the question is whether Golding's misstatement or omission had a "natural tendency to affect the *decision* of the [INS]," not the course of investigation.   *Kungys*, 485 U.S. at 770 (emphasis added).  It is under this standard that the Government must produce clear, unequivocal, and convincing evidence.  It has failed to do so.

In 1991, Golding's then-wife Nancy Golding disclosed that Golding had used the name "Michael Genas" on the Petition for Alien Relative form she filed on Golding's behalf.  (Gov. Ex. 9).  Golding also disclosed on the 1991 Application that he had previously entered the United States under the name "Michael Genas."  (Gov. Ex. 10).  Golding did not, however, check the box indicating he had ever "been arrested, cited, charged, indicted, convicted, fined, or imprisoned for breaking or violating any law or ordinance, including traffic regulations."  (Gov. Ex. 10).

At trial, the Government presented testimony of Jorge Roig, the examiner who examined Golding's I-485 application in February 1991.  Roig testified that if Golding had checked the box on his 1991 Application that he had "been arrested, cited, charged, indicted, convicted, fined or imprisoned for breaking or violating any law or ordinance, including traffic regulations," Roig would have been required to do a follow-up inquiry into the conviction.  Roig testified that he would have taken the additional step of getting information about the conviction from the Jamaican government.  Roig did not, however, testify that his *decision* on Golding's application for permanent residence would have been affected by a proper disclosure.  In fact, when asked I asked whether a juvenile conviction would not have barred admission if the conviction were over

16

five years earlier, Roig agreed that it "would most likely be the case" that the juvenile conviction would not have mattered.

A further review of Golding's immigration history suggests Golding's disclosure of his Jamaican conviction would not have influenced the *decision* of INS in 1991. Although Golding did not disclose his Jamaican conviction on his 2001 Naturalization Application, at the 2008 trial, facts regarding his juvenile conviction were known to the Government and discussed. *See Golding*, No. 05-21095-CIV, 2009 WL 2222779, at *7-10. The Government did nothing after that time—until, perhaps, filing this action—to claim that Golding's permanent residency should be revoked as illegally procured.

In 2009, Golding filed another Form I-485 Application to Register Permanent Residence or Adjust Status, this time disclosing the Jamaican conviction, in an apparent attempt to correct his status in light of Judge Torres' decision. (Gov. Ex. 4). He attached to his 2009 Application an I-601 Waiver of Inadmissibility. (Gov. Ex. 5). On the I-601 Waiver, Golding disclosed "fraud or misrepresentation" as the reason for inadmissibility. Despite the I-601 Waiver, USCIS denied his 2009 Application on August 18, 2010 because Golding was already a permanent resident—*not* because Golding was ineligible to be a permanent resident. (Connie Kaczor Testimony; Gov. Ex. 14). USCIS did not adjudicate the Wavier, and did nothing with the information that Golding provided to correct his previous misrepresentation. (Connie Kaczor Testimony; Gov. Ex. 5).

Furthermore, on November 17, 2010, Golding filed his naturalization application, which was approved in 2011. He disclosed on that application that he had previously used the name Michael Genas, that he had convictions—including the Jamaican conviction—and that he had previously misrepresented a fact to an immigration official. USCIS's approval of the 2010

Application is relevant to the inquiry of materiality of Golding's omission in the 1991 Application because it shows that a USCIS examiner, *with knowledge of all of the information* regarding Golding's juvenile Jamaican conviction, still made the decision to naturalize Golding.

Now, years later, the Government contends it was a mistake for Solea Wright, the immigration examiner who evaluated Golding's 2010 Application, to approve Golding for naturalization—and that the Court should not consider the fact that Golding was naturalized as evidence that he was lawfully admitted to permanent residency in 1991. At trial, Solea Wright admitted she had notice of Golding's criminal history when she affirmed the application. When Wright was asked what, upon later review, made her believe that she made a mistake, she had a hard time coming up with an answer. Even after looking through Golding's file, it was difficult for Wright to identify anything to explain why her decision to naturalize was in error. Wright ultimately said she believed the reason she should not have approved Golding to be naturalized was because Golding had held himself out to be a United States citizen prior to being naturalized. However, at trial the Government produced no evidence to support that Golding had ever held himself out to be a United States citizen prior to his naturalization.

The only place in the record to which it is eluded that Golding held himself out to be a United States citizen is in the 2004 administrative decision affirming the denial of Golding's 2001 Application for Naturalization. There, the adjudications officer, Michael Krawczyk, wrote that Golding filed a request for a review hearing "on the decision to deny [Golding's] application for Naturalization for unlawfully voting in a federal election." (Gov. Ex. 8). However, at trial, Krawczyk had no recollection of discussing with Golding whether he had ever voted in a presidential election or held himself out to be a citizen. Krawczyk testified that the only thing he discussed with Golding during the 2004 appeal process was Golding's criminal history.

Krawczyk further testified that he did not recall why the paragraph about improperly voting in a presidential election was included in the report. The Government's attorney even admitted that was likely a bad "cut-and-paste job," or erroneous use of a template from another immigration appeal, that led to the paragraph about unlawful voting being included in the document.[9]

In short, the only reason that Wright could provide for why her decision to naturalize Golding was an error is based on one paragraph in a decision—a paragraph both Krawczyk and the Government's attorney disavow. Notably, Wright did not say that her decision to naturalize was an error because of Golding's criminal history. Considering that Wright had all of the information about Golding's criminal history and it did not affect her decision to approve the application—and considering Wright could give no credible reason why she erred in approving the application—the Government has not shown that the disclosure of the misstatement would have had a tendency to affect the *decision* of INS.

The Government has not shown by clear, unequivocal, and convincing evidence that Golding illegally procured citizenship by willfully misrepresenting a material fact to obtain permanent residence in 1991.

**b.   Counts II and III: Illegal procurement based on lack of good moral character**

As to Count II and III, the Government alleges that Golding illegally procured his naturalization by giving false testimony at the 2008 Trial and in January 2007 during his deposition. Because of this allegedly false testimony, the Government contends that Golding cannot show that he had "good moral character" for the requisite time period.

Section 1427(a)(3) requires an applicant for naturalization to establish that he was a person of good moral character during the statutory period. 8 U.S.C. § 1427(a)(3). The statutory

---

[9] In fact, in its Closing Statement, the United States concedes this point: "The United States does not contend that Golding made a false claim to citizenship." (DE 98-1 at 5, n.4).

period is the five-year period before applying for naturalization until the moment the applicant takes the oath for naturalization. 8 U.S.C. § 1427(a).   A person who provides false testimony "with the *subjective intent* of obtaining immigration or naturalization benefits" lacks good moral character under 8 U.S.C. § 1101(f)(6). *Kungys*, 485 U.S. at 803.

The only evidence put forth by the Government as to Golding's allegedly false testimony are the transcripts of the 2007 deposition and 2008 Trial, and Magistrate Judge Torres' Findings of Fact and Conclusions of Law from the 2008 Trial. [10]   The Government claims that the discrepancies between the trial and deposition transcripts show that Golding provided false testimony in the five years prior to his 2010 Application, and, therefore, lacked the requisite good moral character necessary to be naturalized.   Additionally, Magistrate Judge Torres found that Golding did not prove in 2008 that he had the requisite good moral character for naturalization.

However, despite this evidence, the Government has failed to prove by clear, unequivocal, and convincing evidence that Golding provided false testimony with the subjective intent of obtaining immigration or naturalization benefits.   Testimony from this trial in January 2016 calls into doubt whether Golding had the subjective intent to provide false testimony— assuming it was false—in 2008. [11]   Golding testified in this trial that, in 2007 and 2008, he was

---

[10] At the 2008 Trial, the burden of proof was on Golding, who was seeking review of a denied naturalization application.   However, in a *denaturalization* action, the burden is on the Government.   Additionally, the burden of persuasion is higher in a denaturalization action. Where a review of a denial of naturalization requires a preponderance of the evidence standard that the applicant is eligible for naturalization, in a denaturalization action the Government must put forth clear, unequivocal, and convincing evidence of the circumstances that justify revocation of naturalization.

[11] In light of the new testimony presented at this trial, I am not convinced that Golding gave false testimony during the 2008 Trial.   For example, at this trial, the Government's own witnesses provided conflicting testimony regarding when the laborers got their ID cards and Form I-94s—

testifying about events that had occurred approximately twenty years earlier and that he had difficulty recalling the circumstances surrounding his entry into the United States.   Golding further testified that at the time of the 2008 trial, he was under the influence of a number of pain medications and relaxants.   The Government presented no evidence to counter Golding's testimony.   Instead, the Government relied solely on the transcripts of Golding's 2007 deposition and 2008 trial, asking the Court to find Golding had the requisite subjective intent based on discrepancies between his testimony.

Accordingly, the Government has failed to show by clear, unequivocal, and convincing evidence that Golding illegally procured naturalization because he lacked good moral character for the statutory period.

### III.   Conclusion

By virtue of becoming a naturalized United States citizen, an individual gains a wealth of advantages not available to a permanent resident.   A citizen has the right to hold a United States passport and receive assistance from United States' Embassies and Consulates while abroad.   A citizen has the ability to live or take long trips outside of the United States, and has the unquestioned right to return to the United States.   A citizen faces security from removal or deportation from the United States and does not have to go through the process and cost to renew permanent residency status upon expiration.   A citizen's children are automatically United States citizens by birth.   Finally, a citizen gains important, fundamental rights—the right to vote in federal elections and the right to serve on juries.

---

whether it was on the ground in Jamaica or when they arrived in the United States. In light of the confusion, the Government has not proven that Golding testified falsely in 2008 about when he was first saw his ID card and Form I-94.

It is because of this value placed on American citizenship that the Government must show "clear, unequivocal, and convincing evidence" justifying revocation in order to strip a naturalized American of his citizenship.  The Government's evidence falls far short of its burden.  The Government's theory of denaturalization has changed over the course of this case, presenting a moving target that is difficult to pin down.   The Government has not been able to show—under any theory—that Golding illegally procured his naturalization.   Golding has repeatedly disclosed that he used the name "Michael Genas" to enter the country, starting with his first application in 1991.  And, although Golding may not have initially revealed his juvenile conviction, the Government was told at least twice about the conviction since Golding was a permanent resident, and it did not change the decision of any subsequent adjudication.   The Government has not demonstrated that Golding was ineligible to become a naturalized citizen.  Accordingly it is hereby

**ORDERED AND ADJUDGED** that final judgment is entered in favor of Defendant Golding and against Plaintiff United States of America.[12]

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this _9_ day of February, 2016.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record
              Delroy Anthony Golding, *pro se*
              1940 SW 68 Avenue
              North Lauderdale, FL 33068

---

[12] Golding has appeared *pro se* since November 2015; prior to that time, he was represented by counsel.  As Golding prevailed against the United States in this action, Golding may be entitled to attorney's fees and expenses, pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d). Any application seeking fees or expenses must be submitted to the Court within thirty days of this final judgment.  28 U.S.C. § 2412(d)(1)(B).